# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 3, 2015

## STATE OF TENNESSEE v. SEBASTIAN PEGUES

**Appeal from the Criminal Court for Shelby County**
**No. 12-06-111     J. Robert Carter, Jr., Judge**

---

**No. W2014-00854-CCA-R3-CD  - Filed May 27, 2015**

---

A Shelby County jury convicted the Defendant, Sebastian Pegues, of two counts of first degree felony murder, one count of aggravated child abuse and one count of aggravated child neglect.  The trial court merged the two first degree felony murder convictions and sentenced the Defendant to life.  The trial court sentenced the Defendant to concurrent twenty-year sentences for the aggravated child abuse and aggravated child neglect convictions.  On appeal, the Defendant asserts that there is insufficient evidence to support his convictions. After a thorough review of the record and applicable law, we affirm the Defendant's convictions and sentences.  We remand this case to the trial court for the entry of a corrected judgment in Count 3, indicating that the convicted offense is aggravated child neglect.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Stephen Bush, District Public Defender; Harry E. Sayle III (on appeal), and Donna Armstard and Cathy Kent (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Sebastian Pegues.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Amy P Weirich, District Attorney General; and Carrie Shelton-Bush and Eric Christensen, Assistant District Attorneys General for the appellee, State of Tennessee.

## OPINION
### I. Background and Facts

This case arises from the death of a three-month-old infant girl. A Shelby County grand jury indicted the victim's step-father, the Defendant, for two counts of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect.

At the January 2014 trial on these charges, the parties presented the following evidence: Felecia Nunn testified that she worked as a 911 dispatcher in Memphis, Tennessee, and received a call on June 25, 2012, from a residence located on South Greer. Ms. Nunn testified that the caller was a male. A recording of the 911 call was played for the jury. During the 911 call, the caller said that he needed an ambulance because his baby was "slowly breathing" and "look[s] like she's gonna die." The caller said that the baby was his daughter. The caller stated that the baby was dozing off and not crying between breaths. He stated that he had given the baby Tylenol. The caller stated that the baby was weak and "slowly dying in [his] arms. . . ." Ms. Nunn instructed the caller to perform CPR by blowing air into the baby's mouth. The caller followed her instructions and then told Ms. Nunn that he thought the baby was dead. The caller then told Ms. Nunn that emergency personnel had arrived. Ms. Nunn said this particular caller stood out to her because he was very calm. Ms. Nunn instructed the caller to begin CPR until firefighters arrived and took over.

Jason Ikner testified that he was a paramedic in Memphis, Tennessee, and that on June 25, 2012, he responded to a residence located on South Greer due to a baby in distress. When he arrived at the home, he was met by the Defendant. The Defendant took Mr. Ikner inside his home and said that his daughter, the victim, was a baby and was having trouble breathing. Mr. Ikner found the victim in a back bedroom lying on an adult-sized bed. The Defendant told him the victim had been sick, had taken medication, and was not breathing well. Mr. Ikner testified that the victim was "definitely . . . in distress." He said that he immediately noticed that the victim was "very depressed like lethargic." He stated that the victim had a "fixed" look on her face and was not breathing at a normal rate for a baby. The Defendant told him he had given the victim Tylenol and showed him the dosage, which Mr. Ikner said was not a large dose.

Mr. Ikner testified that the ambulance arrived quickly to transport the victim. He did not perform CPR at that time because she was still breathing. He explained the term "depressed," stating that it was a medical term related to the victim's respiratory rate and how she interacted with her surroundings. Mr. Ikner said:

> What would be normal like for a baby to cry, coo, breathe fast, movements. None of that was present. It was very slow, delayed. And normally when you . . . get in an infant's face or wave something in an infant's face it grabs their attention and immediately they shift their focus. The baby,

she never appeared like that. Like when I was assessing her . . . she just kind of had an abnormal gaze that wasn't directed at me. It was more just a far off look.

Mr. Ikner recalled that there was another child in the house, the victim's older sibling. The sibling and the Defendant were the only two people in the house. He said that, when he left the house with the victim, she was breathing but "deteriorating."

When he got into the ambulance with the victim, Mr. Ikner informed the other paramedics that the victim was "about to crash" or go into cardiac arrest. He said they immediately laid the victim on the stretcher and put the "EKG leads" on to monitor her heart rate. At that moment, her heart stopped and CPR was administered. He testified that the victim's pulse did eventually return.

On cross-examination, Mr. Ikner said that the paramedics intubated the victim inside the ambulance, meaning they tried to inflate her lungs with oxygen through a tube down her throat.

Dr. Marco Ross testified that he was the Deputy Chief Medical Examiner for Shelby County. He was admitted as an expert in the field of forensic pathology. Dr. Ross identified the autopsy report of the victim, which was entered into record. He stated that he conducted the autopsy on the victim's body and that she weighed sixteen pounds and was three months old at the time of the autopsy.

In his examination of the victim's body, Dr. Ross found a bruise on her right temple consistent with blunt force trauma to that area. On the back of the victim's head, Dr. Ross found a hemorrhage, which he explained as an area of bleeding in the tissue. He testified that there was a similar area of hemorrhage on the right front part of the victim's scalp. Dr. Ross said that, after removing part of the victim's skull, he found a small area of hemorrhage on the right side of the victim's brain. Dr. Ross identified pictures of those injuries, and they were admitted as evidence. He stated that all of the victim's injuries to her head appeared to be acute injuries, meaning that they occurred within twenty-four hours before her death. Dr. Ross testified that it would have taken a minimum of two blows to the victim's head to create those injuries.

Dr. Ross identified pictures of areas of bruising on the victim's torso region, specifically her lower chest and upper part of her abdomen. Dr. Ross testified that he found injuries on the victim's ribs. The victim's fifth through ninth ribs were fractured on her right side, and her third through eighth ribs were fractured on her left side. The eighth and ninth ribs on her backside, where they attach to the spine, had "calluses" indicative of older

fractures to those ribs. He testified that the injuries to the ribs on her right side also appeared to be acute. The injuries to her left side were a minimum of two weeks old. Pictures of the injuries to the victim's ribs were identified and admitted as evidence.

Dr. Ross testified that he could not completely rule out that the victim's rib injuries were caused by CPR, but he stated that his interpretation of the injuries was more consistent with pressure or impact from the side of the body, rather than the front, which would be consistent with CPR. He agreed that the injuries were more consistent with injuries sustained from blunt force trauma. He testified that there were hemorrhages in the immediate vicinity of the fractured ribs consistent with blunt force trauma. Based on the fracture lines on the victim's ribs, Dr. Ross testified that the victim had suffered broken ribs during three different events.

Dr. Ross testified that the victim had suffered bleeding in her right lung, as well as in her heart. Pictures of the bleeding in the victim's lung and heart were identified and admitted as evidence into the record. The presence of the hemorrhage inside the victim's lung indicated that the victim had suffered blunt force trauma rather than injuries sustained during CPR. Dr. Ross testified that the victim had two lacerations on her liver, which he described as "complex," indicative of a "crush type of injury to the liver." Pictures of the injuries to the victim's liver were identified and admitted as evidence into the record. Dr. Ross agreed that it would take a "significant amount of force" to cause this type of injury to the liver. He characterized the injuries to the victim's liver as severe, caused by a very significant impact.

Dr. Ross testified that the victim also suffered hemorrhaging to her duodenum, the connection between her stomach and small intestine, as well as to her pancreas and kidney. He testified that the victim's adrenal gland was split open by a large laceration consistent with a severe injury. He agreed that an adult punching the victim would cause that type of laceration. Dr. Ross testified that, due to her internal injuries, the victim had bled at least half of her blood volume internally.

Dr. Ross testified that he determined the cause of the victim's death to be multiple blunt force injuries. He stated that the victim's injuries were very severe and "associated with a high mortality." He testified that he typically associated these types of injuries with car accidents because of the amount of force necessary to cause the same crushing of the liver suffered by the victim. He stated that, had the victim been resuscitated, she probably would have had to have her liver removed to stop the internal bleeding. He described the injury to her liver as "very, very severe" and stated that the victim would have been in severe pain after sustaining these injuries. Dr. Ross stated that the victim likely went into shock within a matter of minutes after sustaining the injury to her liver. Based on the severity of the injuries, Dr. Ross stated that the victim probably suffered them close to the time that she

-4-

died.

On cross-examination, Dr. Ross agreed that the victim arrived at his office with medical equipment on her body, left in place so that he could ascertain whether any of her injuries or marks were related to the medical equipment. He clarified that the temple, where the victim had a bruise, was on the side of the head between the eye and the ear. He agreed that, near the injury to her temple, the victim had a mark where tape had been placed on her head by medical personnel. He stated that the tape and any piece of medical equipment that had been taped to her head would not have caused her injury. Dr. Ross stated that the injuries to the child's liver and abdomen would have been by someone forcefully squeezing her abdomen, or punching or kicking her abdomen. He denied that her injuries could have come from being hit with a belt buckle. He denied that her injuries were consistent with "Shaken Baby Syndrome."

Officer Euvonnie Keefer testified that she was employed by the Memphis Police Department and responded to a call on June 25, 2012, on South Greer about a baby who was having trouble breathing. The paramedics were present when she arrived at the scene. Inside the house were the Defendant, the victim, and a seven or eight-year-old girl. Officer Keefer spoke with the Defendant, who said the victim was having difficulty breathing and that he had given her medication. At that point, she notified her supervisor, consistent with protocol, and asked the Defendant to remain at the house. Officer Keefer said that the other child in the house was concerned about the victim.

Teresa Pegues testified that she was twenty-seven years old and had two living children. She testified she had another deceased child, the victim, who was born February 28, 2012. She stated that, before her death, the victim had lived with her and her eldest daughter, K.H.,[1] as well as the Defendant, to whom she was married. She stated that she and the Defendant had been married since October 2011. She testified that K.H. was nine years old at the time of trial and that she no longer had custody of K.H.

Ms. Pegues recalled that on June 25, 2012, she had to be at work at 6 a.m. When she left for work that day, the victim and K.H. were still asleep, and the Defendant was awake. She stated that the victim slept in the master bedroom in a crib. Ms. Pegues stated that the victim was acting normally the night before and was very active, smiling, and trying to stand up. About nine or ten o'clock in the morning on June 25, 2012, the Defendant called Ms. Pegues at work and told her that the victim was breathing "funny" and "kind of wheezing." Ms. Pegues told him to give the victim Tylenol drops, which had been prescribed for the victim during a prior episode when she was wheezing. The Defendant later called her and

---

[1] It is the policy of this Court to refer to minors by their initials.

said that emergency services were at their house and that she should go to the hospital.

Ms. Pegues testified that, at the hospital, a doctor met with her in a room and explained to her that the victim's heart had stopped three times and been revived several times. The doctor said that it was not advisable to keep trying to revive the victim because of the lack of oxygen to her brain. Ms. Pegues made the decision not to revive the victim. She later held the victim, and her family members arrived and also held her. Ms. Pegues called the Defendant to tell him what had happened. K.H. arrived at the hospital later and Ms. Pegues asked for assistance from the social workers that were present to tell K.H. that her baby sister had died.

Ms. Pegues said that K.H. burst into tears when she heard that the victim had died. She was scared and upset and shouted, "mama I told you that dad was spanking the baby." Ms. Pegues agreed that she knew what K.H. was "talking about." She said that K.H. left the hospital with her grandmother while Ms. Pegues spoke to the police and the Department of Children's Services. Ms. Pegues agreed that, at the time of trial, she was under indictment for aggravated child neglect related to the victim's death and had retained an attorney after being arrested on November 12, 2012. She recalled that investigators arrested the Defendant the day after, on November 13, 2012, because investigators "felt like he was the cause of [the victim's] death."

Ms. Pegues agreed that she loved the Defendant but had "moved on" from her relationship with the Defendant since finding out what happened to the victim. She agreed that she had a child with the Defendant. Ms. Pegues stated that, before she saw the victim's autopsy photographs, she thought the victim had suffered "just broken ribs and bruising under the skin." She explained that the autopsy photographs showed her how severe the victim's injuries were and that changed her opinion of the Defendant and also changed her relationship with him.

Ms. Pegues testified that her daughter, K.H., was very bright. She stated that, on one occasion, K.H. had scratched the victim's back and left red marks. Ms. Pegues said that, when she was at work, the Defendant would be at home taking care of the victim and K.H. Ms. Pegues stated that, while in the Defendant's care, the victim had been taken to the hospital on one occasion before her death, on April 26, 2012, when she was just two months old. K.H. was not home on this occasion. The Defendant called Ms. Pegues at work and told her the victim had fallen out of the bed. Ms. Pegues said the victim's left side was "completely swollen" after the fall, and the victim's eyes were swollen shut. The Defendant told Ms. Pegues that he left the victim on the bed with him while he slept, and she fell onto the floor while he was sleeping.

On cross-examination, Ms. Pegues agreed that she wrote letters to the Defendant in jail. She stated that she did not see the victim's autopsy photographs until the week before trial. She agreed that there was a possibility she would not be prosecuted for the indicted charges if "everything came out in the clear," and "we found out the truth . . . ." Ms. Pegues agreed that she had said K.H. had a jealousy issue when Ms. Pegues would buy toys for the victim or when she or other adults were giving the victim attention. Ms. Pegues agreed that she did not leave K.H. alone with the baby because she had scratched the baby and because of K.H.'s jealousy issues.

Ms. Pegues stated that on April 26, 2012, she put the victim in the bed with the Defendant while he was asleep and then left for work. She agreed that the victim was "mobile" then. She agreed that her grandmother currently had custody of K.H.

Ms. Pegues testified that on June 25, 2012, the victim was wheezing, meaning her cries were "raspy" like she had asthma. Ms. Pegues said it was not to an extent that the victim seemed out of breath, but there was a difference in her breathing pattern. She said the victim "seemed like she was sore." The Defendant called Ms. Pegues at work and said the victim was wheezing, so Ms. Pegues told the Defendant to give her Tylenol. Ms. Pegues said when the victim had been given Tylenol before, "it cleared everything up," and the victim was "back to her normal self."

Ms. Pegues stated that she explained the difference between spanking and burping the victim to K.H., because K.H. alleged that the Defendant was "whipping" the victim. Ms. Pegues asked K.H. to demonstrate the Defendant's actions, and Ms. Pegues told K.H. that he was burping the victim or "pat[ting] the [victim] on the back." Ms. Pegues stated that K.H. was not strong enough to have inflicted these injuries on the victim.

Felicia Lobbins testified that she was a medical social worker on June 25, 2012, and was present when emergency responders brought the victim to the hospital. Ms. Lobbins met with Ms. Pegues when she arrived at the hospital and took her to where the doctors were "working" on the victim. She was also present when K.H. arrived at the hospital. Ms. Lobbins and other social work staff encouraged Ms. Pegues to tell K.H. about the victim's death while they were still at the hospital and had the support of the staff. Ms. Lobbins stated that Ms. Pegues told K.H. that the victim had died, and K.H. "acted like a much older child. She immediately said to [Ms. Pegues that] she wanted to know what happened." K.H.'s voice was raised, and she was "angry" and "upset." K.H. told Ms. Pegues that the Defendant was "who[p]ping" the victim while Ms. Pegues was at work all day and that the Defendant had been "who[p]ping" the victim that morning. Ms. Pegues and other family members tried to explain to K.H. that she was mistaken.

Crystal Soberg testified that she worked at the hospital as a Child Life Specialist and was familiar with the victim's case. She, Ms. Lobbins, and the hospital chaplain were with the victim's family to provide emotional support. She said the victim's family wanted hers and Ms. Lobbins's help when telling K.H. what had happened to the victim. She said K.H. was very sad when she learned of the victim's death, and then she started getting angry and "words started rattling off, you know, 'well, mom, you know what he does to her. You know, what he does to her when you're at work, when you're gone all day and I hear him hitting her.'" K.H. was angry with Ms. Pegues for leaving the house. Ms. Soberg said that K.H. told Ms. Pegues that the Defendant was "who[p]ping" the victim, and Ms. Pegues tried to clarify that the Defendant was burping the victim. "But, [K.H.] was sure that [she] heard. He was who[p]ping the [victim]."

K.H. testified that she was nine years old and in the fourth grade. She testified that the Defendant was her stepfather, and Ms. Pegues was her mother. She testified that she presently lived with her great-grandmother, "Gee Gee." K.H. testified that she had one sister who was four months old, and another sister, the victim. K.H. testified that she remembered living on South Greer in 2012 with the Defendant, Ms. Pegues, and the victim. She said the victim slept in a crib in the Defendant and Ms. Pegues's bedroom. K.H. said she spent a lot of time with the victim, played with her, and watched television with her.

K.H. stated that on June 25, 2012, she remembered Ms. Pegues getting ready for work early in the morning. Ms. Pegues left for work and K.H., the Defendant, and the victim stayed at home. K.H. stated she was watching television in her bed with the victim in her bed, and she placed the victim right beside her so the victim would not roll off the bed. K.H. said the victim was "fussy" but not crying that morning. The victim was crying "a little later in the morning" when K.H. "put [her] hand over [the victim's] mouth so she couldn't breathe." After that, K.H. took the victim to the Defendant and went to her room crying because she felt guilty about putting her hand over the victim's mouth. Then K.H. "started hearing noise from the living room" that "sounded like who[p]pings," but she was not sure "if [the Defendant] whipped [the victim] or not[.]" K.H. did not "believe" that the Defendant whipped the victim, but she agreed that she heard noises that sounded like "who[p]pings." She did not remember if the Defendant hit the victim.

K.H. testified that the Defendant called 911 and that he gave the victim some medicine "a couple of minutes later" after she heard the whopping sounds. Emergency personnel came to the house and took the victim to the hospital. K.H. remembered that the victim was in the Defendant's lap on the couch after K.H. brought her to him. While giving the victim to the Defendant, K.H. recalled bumping the victim "a little bit" into the couch. She said it was an accident.

K.H. agreed that the Defendant had sent her lots of letters since that day and that he called her a lot. K.H. agreed that the Defendant had asked for her to pray for him to come home. K.H. agreed that she remembered the Defendant telling the victim that she was "going to learn to stop crying[.]"

On cross-examination, K.H. stated that a "who[p]ping" was a "punishment."

Letitia Cole testified that she was a forensic interviewer at the Memphis Child Advocacy Center and interviewed K.H. in connection with the victim's death. Ms. Cole recalled that K.H. was "clear" about what had happened to the victim. Ms. Cole recalled that K.H. did not tell her about putting her hand over the victim's mouth, but she said that the victim started crying and the Defendant asked K.H. to bring the victim to him. K.H. told Ms. Cole about hearing noises in the other room that "sounded like someone was getting a who[p]ping." K.H. also told Ms. Cole that it sounded like a belt was being used and that the Defendant had spanked the victim in the past.

Lieutenant Carl Ray testified that he worked for the Memphis Police Department and was assigned to the Child Juvenile Abuse Squad in June 2012. He responded to a call on South Greer on June 25, 2012. The Defendant, K.H., and the police were present at the house when he arrived, the victim having already been transported to the hospital. Lieutenant Ray spoke to the Defendant, who stated that he was trying to sleep and that the victim would not stop crying. He called Ms. Pegues who told him to give the victim some Tylenol to help her sleep.

Lieutenant Ray said another officer was speaking with K.H. while he took notes of their conversation. He recalled that K.H. said that the victim cried a lot, and it frustrated the Defendant. K.H. said "something about a who[p]ping."

Vicki Watts testified that she worked for the Department of Children's Services as an investigator of child neglect cases. She testified that she spoke with K.H. on the day the victim died. Ms. Watts recalled that K.H. stated that:

> She was watching [the victim] in her bedroom. [K.H.] said that they were watching television. [K.H.] stated that [the victim] became irritable. [The victim] was starting to cry. [K.H.] stated that she put [the victim] in her car seat and started to rock her in the car seat to try to sooth[e] her. [K.H.] stated that she picked [the victim] up and, you know, out of the car seat trying to get [the victim] to watch television with her but the [Defendant] came in and got [the victim] from her and took [the victim] into another room.

Ms. Watts then stated that K.H. said "she didn't see anything" but K.H. told Ms. Watts "that it sounded like [the Defendant] was hitting [the victim] with a belt. [K.H.] stated that [the victim] was crying so loud to where she became hoarse." Ms. Watts remembered K.H. telling her that she heard the Defendant tell the victim that she was "going to learn to stop crying[.]"

Ms. Watts also spoke with the Defendant that day. The Defendant told Ms. Watts that if the victim's autopsy report showed that she had broken ribs, it would be because "911 told him to do CPR."

Dr. Karen Lakin testified that she was an Assistant Professor of Pediatrics at the University of Tennessee and the Medical Director at the hospital where the victim was treated. Dr. Lakin testified as an expert witness in the fields of general pediatrics and child maltreatment and abuse. She stated that she was asked to review the victim's records by the Department of Children's Services and by the District Attorney's Office. Dr. Lakin was provided the victim's hospital records from April 26, 2012, and June 25, 2012. The paramedics' records, reports from the investigation, interviews, and autopsy records were also provided to Dr. Lakin.

Dr. Lakin testified that the victim was seen in the hospital's emergency department on April 26, 2012, for "facial bruising that was reported to have occurred from falling from the bed while [the victim] was sleeping with [the Defendant.]" Dr. Lakin testified that the victim returned to the hospital on June 25, 2012, in "extremely critical condition" and then died at 1:20 p.m. on June 25 while in the hospital. The cause of death listed on the autopsy was "multiple blunt force injuries."

Dr. Lakin testified that the victim arrived at the hospital at 11:11 a.m. on June 25, 2012. Dr. Lakin explained that blood was drawn from the victim very quickly to allow the staff "get a lot of information quickly" about the victim. Within a few minutes of the victim's arrival, blood tests indicated that the victim's "hematocrit" level, the percentage of red cells in the body, was 23 and her "hemoglobin" level, or blood protein level, was 7.8. Dr. Lakin testified that those values "were almost half of what the normal value should be" in an infant. A second round of blood was drawn and tested seventeen minutes later, and the victim's hematocrit level had dropped to 13.6 and her hemoglobin level to 4.6. Dr. Lakin stated that the normal hematocrit level was around 35 to 40 and the normal hemoglobin level was about 10 to 12. The dramatic drop between the two blood tests indicated that the victim was "actively bleeding."

Based on the victim's autopsy reports, Dr. Lakin testified that the victim had "a number of injuries." Dr. Lakin further testified:

[The victim] had a number of abnormalities on arrival in her lab work including her sodium was very high, her chloride was very high. The carbon dioxide was low. Everything was just very deranged which is something that we do see in a child that is suffering from shock. Also . . . there are enzymes that are produced by the liver. And so even before the autopsy there was huge concern that there may have been some type of liver trauma because [the enzyme levels] . . . you can see the normal values are 20 to 64. So we're talking, you know, [the victim's enzyme levels were] thousands of times the normal level.

And as well there is another enzyme that's associated with the pancreas and it was also extremely high. So there was already concern of some type of intra abdominal injury that was going on . . . ."

Dr. Lakin testified that "heightened enzyme levels" are a "marker for blunt force trauma." Dr. Lakin testified that the victim had a "subdural hemorrhage" and explained:

A subdural hemorrhage is very concerning in and of itself[,] by itself for non-accidental trauma in the absence of a history of significant head trauma. It's an unusual place to get bleeding to begin with because . . . that dura is adhered fairly close to the brain itself. And so in order for those vessels to rupture, you have to have some significant trauma to [the] head in order for those – for vessels to rupture. Subdural hemorrhage is commonly associated with abusive head trauma in [an] infant because . . . one of the mechanisms that we believe occurs is very rapid acceleration, deceleration injuries that occur with violent shaking. And that's why it so alarms pediatricians when we see a diagnoses of subdural hemorrhage and is considered one of the highly suspicious injuries.

Dr. Lakin testified that it was her opinion that the victim's head injuries came from at least two different blows.

Dr. Lakin testified that the victim had two areas of rib fractures on her left side. Some of the rib fractures were older, as indicated by the calluses on the bone. The area of rib fracture on the victim's right side was acute, meaning there was no callus formation. About the hemorrhages in the victim's lung, Dr. Lakin stated that they were "very concerning for blunt trauma, very unusual."

Dr. Lakin testified about the injuries to the victim's liver and adrenal glands. The injury to her liver was "in a crush pattern" and "look[ed] like ground beef," meaning that the

tissue in the victim's liver was "falling apart." The injuries to the victim's adrenal glands were "highly, highly, highly, unusual, very rare, not only in children but adults outside of any significant history of trauma like major car accident, major blunt force trauma to the abdomen." Dr. Lakin stated that an adrenal gland injury occurs in children "that have sustained blunt force trauma, major trauma from motor vehicle accidents or from falling from numerous stories [out of a building], two or three story falls . . . They are very significant injuries. And then the other high [rate] of adrenal injuries is from inflicted abdominal trauma."

Dr. Lakin testified that the victim had lost approximately half of her blood volume due to "extensive hemorrhag[ing.]" This was consistent with the paramedic's description of the victim barely breathing and not focusing which Dr. Lakin stated indicated the victim was in "shock and coma."

Dr. Lakin stated that there was no chance that the victim's injuries could have been sustained during CPR or by being bumped into a piece of furniture. She denied that the victim's eight-year-old sibling could have caused these injuries because the injuries were "very significant" and not the type of injury sustained "during routine play." Knowing that the victim's sibling was a fifty-pound child made it even less likely in Dr. Lakin's opinion that the sibling caused the victim's injuries because "children are not typically characterized as being able to even have the strength to inflict that type of trauma." Dr. Lakin stated that with the injuries to the victim's liver and adrenal glands, it was unlikely that the victim was able to cry, or any crying would have been brief before losing consciousness.

On behalf of the Defendant, JoAnn Hansborough testified that the Defendant was married to her granddaughter, Ms. Pegues. She stated that she currently had custody of K.H. Ms. Hansborough stated that she was present at the hospital on June 25, 2012.

Sharon Hansborough testified that she was Ms. Pegues's mother and the victim's grandmother. She stated that she had observed the interactions of K.H. and the victim in the past and stated that K.H. was jealous of the victim and exhibited childish behaviors when the victim was present. K.H. cried a lot after the victim was born, and she also scratched the victim on one occasion. Ms. Hansborough described K.H. as "overly emotional" around the victim.

Following this evidence, the jury convicted the Defendant of two counts of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect. The trial court merged the two first degree felony murder convictions and sentenced the Defendant to serve a life sentence for the murder conviction with concurrent twenty-year sentences for the aggravated child abuse and aggravated child neglect

convictions. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. He contends that the State did not prove that he inflicted the victim's injuries and that Dr. Ross's testimony that it was possible that K.H. caused the injuries created a reasonable doubt as to the Defendant's guilt of aggravated child abuse. The Defendant further contends that the State failed to prove that the Defendant knowingly neglected the victim, a required element of aggravated child neglect. The State responds that the proof shows that the Defendant was alone with the victim at the time of her injury, thus allowing the jury to conclude that the Defendant caused the victim's injuries and that the Defendant was the sole adult responsible for the victim's care when the neglect resulted in serious bodily injury to the victim. The State further claims that the evidence of the severity of the victim's injuries was sufficient for the jury to infer that the injuries were inflicted by an adult. For those reasons, the State claims that the evidence is sufficient to sustain the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the

evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As relevant to this case, felony murder is a killing of another committed in the perpetration of aggravated child abuse or aggravated child neglect. T.C.A. § 39-13-202(a)(2) (2014). Aggravated child abuse occurs when the accused knowingly, other than by accidental means, treats a child under the age of eighteen in such a manner as to inflict injury and the act of abuse results in serious bodily injury to the child. T.C.A. §§ 39-15-401(a), -402. Aggravated child neglect occurs when the accused knowingly treats a child under the age of eighteen so as to adversely affect the child's health and welfare and the act of neglect results in serious bodily injury to the child. *Id.* An accused acts "knowingly" with respect to his or her conduct "when [he or she] is aware of the nature of the conduct." T.C.A. § 39-11-302(b).

The Defendant argues that the State failed to prove that he "knowingly" committed aggravated child abuse because there was no direct proof that he knowingly or intentionally

-14-

caused the injuries to the victim  As we previously stated, a criminal offense may be established solely by circumstantial evidence.  It is for the jury to determine "the weight to be given to circumstantial evidence, . . .'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" *Rice*, 184 S.W.3d at 662.  Therefore, we review circumstantial evidence under the same standard as direct evidence. *Dorantes*, 331 S.W.3d at 379.

The evidence, viewed in the light most favorable to the State, showed that the Defendant was the sole adult caring for the victim, a three-month-old child, and for K.H. while Ms. Pegues was at work on the morning of June 25, 2012.  The Defendant called 911 at approximately 10:30 a.m. and told the operator that the victim was having trouble breathing.  Jason Ikner testified that, when he arrived to treat the victim, she was not acting like a normal baby.  He said the victim was unable to focus her eyes, did not cry out, and was not moving.  Medical testimony showed that the victim was in a state of shock at the time after having lost half of her blood volume due to extensive internal bleeding.  Medical testimony showed that the bleeding was caused by the victim having sustained multiple severe injuries to her liver, including lacerations and "crush" injuries, as well as highly unusual injuries to her adrenal gland, consistent with major blunt force trauma.  The autopsy indicated the cause of death was non-accidental blunt force trauma.

The victim sustained injuries to several areas of her ribs, some of which were at varying stages of healing, indicating that the victim had sustained injuries on more than one occasion.  The victim had also sustained injuries to her head in several areas and was suffering from a subdural hemorrhage, which Dr. Larkin testified was a highly suspicious injury that often alerted pediatricians to instances of abusive head trauma.  The victim's injuries were very severe, and the medical testimony was that she would have been unable to live very long after sustaining these significant injuries.  The victim died at 1:20 p.m. on June 25, 2012; she had been in the Defendant's care since 6:00 a.m. that morning.

K.H. testified that she and the Defendant were with the victim on the morning of June 25, 2012, and that when the victim started crying, K.H. took her to the Defendant.  When K.H. later learned that the victim had died, she was upset and angry, shouting to her mother that the Defendant had been whipping the victim because she cried too much.  We acknowledge K.H.'s grandmother's testimony that K.H. was jealous of the victim and had physically harmed her in the past by scratching her.  K.H. also testified that she placed her hand over the victim's mouth causing her to cry.  Medical testimony, however, was that the victim's injuries were too severe to have been inflicted by a child of K.H.'s age and size; the victim's injuries were more consistent with her falling out of a two- or three-story building or with a major car accident.

This evidence is sufficient for a jury to find the Defendant guilty beyond a reasonable doubt of first degree felony murder and aggravated child abuse and child neglect. The victim sustained severe injuries to her head, ribs, liver, and adrenal glands. The Defendant contends that the proof does not exclude the reasonable inference that the victim's injuries were caused by K.H. or by the victim's previous fall from the bed. The jury heard K.H.'s statements about her treatment of the victim. The jury, however, also heard the medical testimony indicating that the victim sustained severe traumas to multiple areas of her body, some over a period of time. It is within the province of the jury to assess witness credibility and determine the weight and value to be given to the evidence. *Bland*, 958 S.W.2d at 659. The jury, by its verdict, credited the medical testimony in this case that the injuries were caused by major blunt force trauma not inflicted by K.H. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE